UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES**, <br><br> Petitioner, <br><br> v. <br><br> **OFFICE DEPOT**, <br><br> Respondent. | Case No. 1:24-mc-00034 (TNM) |

**MEMORANDUM OPINION**

The Fourth Amendment is a tricky thing for government contractors. On one hand, it protects businesses from onerous government searches. *Morton Salt. Co. v. United States*, 338 U.S. 632, 652 (1950). But on the other, companies doing business with Uncle Sam can find themselves enduring internal probes they would never face from another private party. *See Zap v. United States*, 328 U.S. 624, 628 (1946), *vacated on other grounds*, 330 U.S. 800 (1947). This case presents just such a situation. The U.S. Postal Service Inspector General's Office sent Office Depot a subpoena for voluminous business documents to verify the company's compliance with the parties' three-year contract. Office Depot now resists what it calls "burdensome" production. ECF No. 8 at 7.

Negotiation has narrowed the subpoena's scope. *Id*. Now, each party argues that its new, more modest suggestion meets the contract's requirements and that the other party's demand flouts their agreement. Neither is fully right. The Court thus will modify the terms of the subpoena according to its own judgment about the contract's terms. In this modified form, USPS's petition to enforce the subpoena will be granted in part and denied in part.

I.

Office Depot and USPS have a longstanding business relationship. ECF No. 8 at 1. Their most recent contract became effective in February 2020. ECF No. 2-2. The parties' dispute about that contract centers on a provision that they call the "Most Favored Customer Pricing" Clause. *See, e.g.*, ECF No. 8 at 3; ECF No. 11 at 2. In that Clause, leaving disputed terms aside or highly generalized, Office Depot promises to give USPS the same pricing as its "top customers" that purchased certain products "in an amount closest to the amount purchased by the Postal Service"—that is, in bulk. ECF No. 8 at 4. Those certain products that receive special pricing are called "Core Products," defined as 20% of the items USPS bought that represented 80% of the purchasing volume. ECF No. 2-2 at 32.[1] So USPS would receive discounts on the products it purchased in the highest quantities, and those discounts would be similar to comparator customers' pricing. As part of the Clause, the parties appear to agree that Office Depot promised some type of reporting that allowed USPS to verify that it had received the correct Most Favored Customer Pricing. ECF No. 8 at 4; ECF No. 5–6. Mechanically, the parties arranged the pricing in the form of a rebate; Office Depot would calculate the appropriate price, then send a rebate for the prior year to USPS to reimburse it for any difference between the Most Favored Price and the price that USPS had paid. ECF No. 8 at 4.

In September 2021, USPS requested its rebate for the 2020 year. ECF No. 8 at 4. Office Depot sent a rebate and, alongside it, a comparator report with four other customers to justify the rebate. *Id.* About eight months later, USPS asked Office Depot why there were only four comparator customers instead of ten. *Id.* The company explained that its position as an "essential service" during the pandemic limited the pool of customers purchasing products in

---

[1] All citations use general CM/ECF numbering rather than internal exhibit pagination.

quantities similar to USPS. *Id.* During that same month, May 2022, Office Depot submitted rebate calculations for the 2021 year that provided only one comparator. *Id.* In June, USPS asked for an explanation again; the company insisted that it had only identified one customer that qualified as a similar customer to USPS because a comparator (1) had to have purchased a quantity within 20% higher and 15% lower than USPS and (2) it could not be a conglomerate or purchasing organization. *Id.* USPS approved all rebates for the three-year contract—for years 2020, 2021, and 2022. *Id.* at 4–5.

In November 2022, the USPS Office of the Inspector General sent Office Depot a subpoena requesting data for "all sales transactions to USPS and Non-USPS customers for all SKUs/items sold to the Postal Service" under the first and second year of the contract. ECF No. 2-1 at 3. Office Depot produced "some of the requested documents" but, instead of fully complying, disputed the scope of the subpoena. ECF No. 8 at 5. Specifically, the company claimed that the investigation should extend only to comparator customers rather than all customers. *Id.* Its production left out records pertaining to Non-USPS customers for all of the SKUs that USPS had requested. ECF No. 1-2 ¶ 30. The OIG then agreed to request only ten other customers who bought high volumes of the same items as USPS. ECF No. 8 at 7. Office Depot countered that it could offer customers with sale volumes that are 50% above and 50% below that of USPS, but OIG did not respond. *Id.* at 9.

Before turning to the legal standards, one final factual note remains. Office Depot proffers extensive data predicting that the USPS OIG's production request will be arduous to fulfill. The company claims that its computers "cannot support searches of more than 100,000 rows at a time, and even searches at that size take upwards of 40 minutes to load." ECF No. 8 at 6. For large-volume SKUs—those that OIG requests—each query would return over 1,000,000

3

rows of data.  *Id.*  Office Depot estimates requiring 10 queries to capture the appropriate information for one year for each SKU, which would take about 500 minutes.  *Id.*  This process must be manually monitored and "very large data pulls sometimes crash the system."  *Id.*  Office Depot states that fulfilling OIG's request would require 280 SKUs, or at least 112,000 minutes, or 1,867 hours.  *Id.*  Quality checking and anonymizing would compound that time.  *Id.*  On top, the subpoena requests contractual terms with other customers.  *Id.*  All in, the company forecasts a "herculean effort that would likely take more than a year."  *Id.*

This Court has subject matter jurisdiction over the matter.  *See* 5 U.S.C. App. § 6(a)(4) ("[A] subpoena, in the case of contumacy or refusal to obey, shall be enforceable by order of any appropriate United States district court[.]"); 28 U.S.C. § 1331 (conferring "original jurisdiction of all civil actions, suits, or proceedings commenced by the United States").  The parties' dispute is now ripe for consideration.

## II.

The government has broad authority to inspect its civil programs.  USPS is one of many agencies that have an Office of the Inspector General to perform these auditing and investigative duties.[2]  Congress tasked OIGs with "supervising the performance of investigative activities" relating to civil-service operations.  5 U.S.C. App. § 3(d)(2).  To perform those functions, Congress authorized OIGs to investigate programs' administration when doing so is, "in the judgment of the Inspector General, necessary or desirable," and "to require by subpoena the production of all information . . . necessary."  5 U.S.C. App. § 6(a)(4); *see Resol. Tr. Corp. v.*

---

[2] *Statutory Inspectors General in the Federal Government: A Primer*, CONG. RESEARCH SERV. (Nov. 13, 2023), https://crsreports.congress.gov/product/pdf/r/r45450; *About Us*, OFF. INSPECTOR GEN. (2024), https://www.uspsoig.gov/about-us.

*Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994) ("Administrative agencies wield broad power to gather information through the issuance of subpoenas.").

Courts have narrowed administrative agencies' broad statutory powers to satisfy the Fourth Amendment. The Supreme Court has identified both relevance and burdensomeness as the limiting principles. *Morton Salt. Co.*, 338 U.S. at 652; *See v. City of Seattle*, 387 U.S. 541, 544 (1967) ("It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."); *accord SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1031 (D.C. Cir. 1978).

Courts can modify administrative subpoenas to conform to these constitutional limits as part of their statutory authority over enforcement. *Arthur Young & Co.*, 584 F.2d at 1033 ("Surely, then, in formulating protective conditions for administrative subpoenas, courts may resort analogously to techniques conventional to judicial subpoenas . . . ."). Doing so is a common practice in this circuit. *See, e.g.*, *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980); *SEC v. McGoff*, 647 F.2d 185, 187 (D.C. Cir. 1981).

It is the subpoena opponent's burden to show that the request is overly burdensome or irrelevant. *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977). As for relevance, the D.C. Circuit has "held that the agency's own appraisal of relevancy must be accepted so long as it is not obviously wrong." *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resol. Tr. Corp.*, 5 F.3d 1508, 1516 (D.C. Cir. 1993) (cleaned up). As for burdensomeness, "some burden on the subpoenaed party is to be expected." *FTC v. Boehringer Ingelheim Pharms., Inc.*, 898 F. Supp. 2d 171, 175 (D.D.C. 2012). And courts have enforced subpoenas when the "breadth complained of is in large part attributable to the magnitude of the producers' business operations." *FTC v.*

*Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977). But they also have considered modifying investigative subpoenas when "compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *Id.*

Finally, the Supreme Court has held that "when petitioner[s], in order to obtain the government's business, specifically agree[] to permit inspection of [their] accounts and records, [they] voluntarily waive[] such claim to privacy which [they] otherwise might have had as respects business documents related to those [government] contracts." *Zap*, 328 U.S. at 628. *Morton Salt* provides a general test for agency subpoenas' enforcement and *Zap*, contemporary with *Morton Salt*, applies the Fourth Amendment specifically to government contractors challenging those subpoenas.

### III.

This Court will hew to the parties' contract to narrow the subpoena's scope. Other courts have enforced subpoenas beyond the bounds of government contractors' terms. *See e.g.*, *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 171 (3d Cir. 1986). The Fourth Amendment waiver is a floor, not a ceiling, on the Inspector General's subpoena authority. But here, Office Depot has made a substantial burdensomeness argument that implicates "disrupt[ion]" of normal business. OIG has not questioned the company's claims on this score. So the burdensomeness showing counsels against granting the subpoena in full. The relevance consideration has little bearing on this decision because OIG's assessment is not "obviously wrong." The Court also declines to fully reject the subpoena because the Circuit has done so rarely, and primarily when the OIG lacks statutory authority to pursue the investigation. *See Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683 (D.C. Cir. 2017). Throughout the Court's analysis, the contract provides both a source of law for the scope of Office Depot's

Fourth Amendment waiver and a source of facts informing what burden the company may have considered proper to contractually assume.

On to the contract. There appear at first glance to be two dispositive sections: the definition provision and the Most Favored Customer Pricing Clause.

The first one ends up being illusory. The definition for "examination of records" simply refers to the contents of the Most Favored Customer Pricing Clause. ECF No. 2-2 at 40, cl. 4-2. It defines "records" in a generic fashion, and goes on to state that "*[i]f the supplier is required* to furnish cost, funding or performance reports, the contracting officer or any authorized representative of the Postal Service will have the right to examine and audit the supporting records and materials . . . ." *Id.* cl. 4-2(b)(1), (4) (emphasis added). The Postal Service's contractual investigative authority hinges on whether the Most Favored Customer Pricing Clause requires the supplier to furnish the reports in the first place. The definitions provision does nothing to expand the more specific comparator terms.

Turn now to the central debate: the meaning of the Most Favored Customer Pricing Clause. The Court interprets the parties' briefing to present three questions.

First, does the Clause require that Office Depot provide ten comparators, or only its top ten customers in the aggregate? Office Depot points to Section (b) of the Clause:

> [T]he supplier shall prepare and provide a comparative report of Postal Service's and ten (10) of the supplier's top customers' purchase and pricing data, including rebates and discounts, by the top items that represent 80% of the Postal Service sales volume and quantity for the prior contract year (the "Top Items") . . . .

ECF No. 2-2 at 33, cl. 2-48; ECF No. 8 at 9.

That sentence admittedly is unclear about whether the company can aggregate its customer lists.

OIG counters that the contracting officer requires ten comparators for each product to verify that the company is complying with the Clause Pricing for each product; otherwise, it is impossible to verify that USPS is receiving the same as the lowest price for the top ten comparators for each SKU. ECF No. 11 at 5.

Neither party points toward the final sentence in section (b): "For purposes of identifying other customers to include in the report for *each of the Top Items, the supplier shall include at least ten (10) other customers that purchased the Top Items* in an amount closest to the amount purchased by the Postal Service." ECF No. 2-2 at 33, cl. 2-48 (emphasis added). The Court finds this sentence dispositive on the first question. So the contract requires a comparative list of ten other customers for each SKU.

Next, section (b)'s comparator requirement discusses "Top Items" rather than "Core Products," though the parties mainly debate the latter phrase's meaning. This leads to the second question: What is the difference? And does the distinction mean that non-"Core Products" relate to the contract so that OIG can request information about them?

Office Depot contends that non-Core Products are not included because the language at the top of section (a) governs: "[T]he following Most Favored Customer Pricing (MFCP) clause shall apply to all Core Products . . . ." *Id.* at 32, cl. 2-48; ECF No. 8 at 10. So all following comparator report requirements, the company reasons, must only apply to Core Products.

Two features of the contract counsel in USPS's favor. *First*, the language discussing "Core Products" only appears as part of section (a), whereas section (b), governing comparator reports, is separate. ECF No. 2-2 at 32–33. Office Depot acknowledges that the beginning of

8

section (a) is not "explicitly" referenced in section (b). ECF No. 8 at 10. But Clause 2-48, the Most Favored Customer Pricing Clause, is separated into multiple distinct sections so that it would make little sense to read one provision as governing the other without language so indicating. ECF No. 2-2 at 32–33. Office Depot points to no such text.

*Second*, section (b) uses the phrase "Top Items" rather than "Core Products." *Id.* That section also defines "Top Items" as, to reiterate, "the top items that represent 80% of the Postal Service sales volume and quantity for the prior contract year." *Id.* The difference between this definition and that of Core Products? The Core Products Clause contains a "20 rule" in addition to the 80% parameter, defining the 20% of the items that make up 80% of the sales. *Id.*

Though these two sets would largely overlap, they may not entirely. If USPS had purchased a greater diversity of items one year so that the top 25% of SKUs purchased comprised 80% of their purchasing volume, then the SKUs on the 20–25% margin presumably would fall within the Top Items but outside the Core Products definitions. The potentially broader category of items captured in section (b) can act as a check for USPS in evaluating Office Depot's compilation of Core Products. In any event, the Top Items definition controls the comparator reports, not the Core Products one. So the contract requires Office Depot to provide data from sales of non-Core Products that fall within the definition of Top Items. OIG is well within its rights to subpoena this information.

Finally, the parties debate whether OIG can request data for all customers or just those purchasing in bulk, or, more precisely, "in an amount closest to the amount purchased by the Postal Service." ECF No. 2-2 at 33; ECF No. 8 at 9. Recall that the parties' negotiations broke down over how similar the comparators' purchases had to be to USPS's purchases. Though USPS does not insist on its right to data from all customers in its reply brief, ECF No. 11, the

9

original subpoena contains such sweeping language.  ECF No. 2-1 at 3 (requesting "all sales transactions to USPS and Non-USPS customers for all SKUs/items sold to the Postal Service under the [instant] contract").

For this third issue, the contract favors Office Depot.  As before, the comparator clause is in section (b), which requires a report with at least ten customers "that purchased the Top Items in an amount closest to the amount purchased by the Postal Service."  ECF No. 2-2 at 33.  This clause clearly delineates the comparator data among only those customers with similar purchasing volume, not all customers buying the same items as USPS.  Even though OIG could theoretically subpoena information beyond its contracted reporting rights, here requiring all customers' data would be exceedingly burdensome.  *See* ECF 8 at 6.

The Court thus will modify OIG's subpoena to reflect USPS's contractual rights.  For the same time periods that OIG has already requested (February 1, 2020–January 1, 2021, and February 1, 2021–January 31, 2022), Office Depot must produce a comparator report with the top ten customers for each of the Top Items including customers who have purchased the Top Items in "an amount closest to the amount purchased by the Postal Service."

To the extent that the parties disagree about the "amount closest" language, Office Depot will provide the ten customers that bought the amount closest in absolute value to USPS.  The percentage points of purchasing volume are irrelevant, despite the parties' back-and-forth on the topic, because the Court has no evidence that this understanding was incorporated into the instant contract.  ECF No. 5 at 5; Pazerunas Decl. ¶ 12; Gaab Decl. ¶ 14.

## IV.

For these reasons, the petition to enforce the subpoena is granted in part and denied in part. The Court will enforce the subpoena as modified in this opinion. A separate order will issue today.

Dated: October 31, 2024                                  TREVOR N. McFADDEN
                                                         United States District Judge